**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MADELINE BUCCERI, PATRICIA TRUJILLO
and LOURDES LO, on behalf of themselves and all
others similarly situated,

                          Plaintiffs,

        -against-

HOWARD ZUCKER, in his official capacity as
Commissioner of the New York State Department
of Health, HF MANAGEMENT SERVICES, LLC,
SENIOR HEALTH PARTNERS, INC., HF
ADMINISTRATIVE SERVICES, INC.,
HEALTHFIRST, INC. and HEALTHFIRST
HEALTH PLAN, INC.,

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

16-cv-8274

**CLASS ACTION COMPLAINT**

Plaintiffs Madeline Bucceri, Patricia Trujillo and Lourdes Lo, on behalf of themselves

and all others similarly situated, and by their attorneys, The Legal Aid Society and Winston &

Strawn LLP, state the following for their class action Complaint:

## INTRODUCTION

1.     This is a case about thousands of severely disabled and homebound New Yorkers

who are being deprived of needed home care services – and placed at risk of physical injury and

institutionalization – due to the hands-off manner in which New York State is privatizing

Medicaid services. Plaintiffs Madeline Bucceri, Patricia Trujillo and Lourdes Lo bring this action

individually and on behalf of a class of current and future Medicaid recipients who receive or

will receive Medicaid-funded home care services under New York State's Medicaid Plan from

one of two Healthfirst managed long term care ("MLTC") plans: Senior Health Partners, Inc.

("SHP"); and CompleteCare, which is administered by Healthfirst Health Plan, Inc. (collectively

referred to hereinafter as the "Healthfirst MLTC plans"). The Healthfirst MLTC plans are providing (or will be providing) home care services to class members because the agency responsible for administering New York's Medicaid Plan, the New York State Department of Health and its Commissioner Howard Zucker ("DOH"), has contracted with the Healthfirst MLTC plans and delegated to them the responsibility of administering the provision of home care services to a portion of New York's vulnerable Medicaid population. The "Healthfirst Enterprise" includes two for-profit entities at the top of the corporate pyramid, also named as defendants in this action, HF Management Services, LLC, and HF Administrative Services, Inc., with the Healthfirst MLTC plans and other entities being subservient to the Enterprise's profit motive.

2.      The Plaintiff class consists of thousands of indigent and disabled adults living in the New York metropolitan area who require assistance with basic activities of daily living and who are at risk of institutionalization because Defendants are failing to ensure that they receive the medically necessary home care services that will address their health needs and allow them to remain safely in their homes. Each of the named Plaintiffs has asked for an increase in their home care services to address their many needs. Instead of timely recording, assessing and determining the outcome of those requests using prescribed medical and administrative standards, Defendants have either ignored their requests or used flawed systems of assessment and determination that systematically and unlawfully deny or reduce the needed services. The result is injury to Plaintiffs, not only to their legal rights and dignity, but physical and psychological pain caused by their lack of adequate and timely care guaranteed by the Medicaid Act. *See, e.g.,* 42 U.S.C. § 1396a(a)(17)(19).

3.      DOH knows or should know that the Healthfirst MLTC plans are systemically failing to provide medically necessary services. Federal law requires DOH to supervise the activities of the MLTC plans, including auditing records and patient files. *See, e.g.,* 42 C.F.R. §§ 438.204(B), 438.416, 438.228(b). Numerous advocates for Medicaid recipients have repeatedly alerted DOH about the many ways that the Healthfirst MLTC plans are violating the law and undermining recipients' rights, without meaningful response from DOH. DOH issued more than 100 administrative hearing decisions in a one-year period involving the Healthfirst MLTC plans' denials of Plaintiffs' requests for additional home care hours. In 80% of those cases, the original decision of the Healthfirst MLTC plans was either reversed or the plans caved and changed or withdrew their original decisions, effectively acknowledging that their original decisions were wrong. The fair hearing results clearly indicate that in 80% of those cases, the Healthfirst MLTC plans were wrongly denying requests for increases. This persistent level of error was a dead giveaway that the Healthfirst MLTC plans were improperly limiting recipients' home care services. Yet DOH did nothing in response.

4.      Either DOH is failing to oversee and monitor the Healthfirst MLTC plans or it is turning a blind eye to the abuses it sees. Either way, DOH is allowing the Healthfirst Enterprise to reduce costs by stripping this vulnerable population of their Medicaid rights and needed services. This heartless and calculating pattern of behavior leaves vulnerable Medicaid recipients at risk of serious injury or institutionalization.

5.      Defendants' acts and omissions have resulted in a host of violations of federal and state laws designed to protect vulnerable, medically-needy Plaintiffs with disabilities. *First*, they have violated the Medicaid Act's requirement by (a) failing to provide medically necessary mandatory services to Plaintiffs and (b) failing to provide services with reasonable promptness.

*Second*, Defendants have violated Plaintiffs' rights to due process, guaranteed by the U.S. Constitution and the Medicaid Act itself, by having inadequate procedures in place for handling, assessing and appealing requests for increased home care benefits. *Third,* they have discriminated against Plaintiffs under federal anti-disability discrimination laws -- the Americans with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act ("Section 504") -- by (a) failing to provide adequate home care services to Plaintiffs, which places them at risk of being institutionalized in the more restrictive setting of nursing homes; and (b) using methods of administration that deprive Plaintiffs of meaningful access to home care services.

6.      And, DOH has unconstitutionally delegated legislative and its rule-making authority over New York's Medicaid Plan to the Healthfirst Enterprise, an amalgam of private parties with a financial interest in reducing how much is spent on home care services for New York's Medicaid recipients who depend on those services so heavily. DOH is looking the other way while the Healthfirst Enterprise guts the home care services upon which New York's vulnerable Medicaid recipients depend. DOH is abdicating its responsibilities under the Medicaid Act (Title XIX of the Social Security Act, 42 U.S.C. § 1396, et seq.), and federal and state Medicaid regulations, allowing the Healthfirst MLTC plans to exercise rule-making authority so as to deny, terminate or reduce home care services for the State's vulnerable Medicaid recipients. The United States Constitution bars DOH from abdicating its authority and delegating it to a private entity with such rampant conflicts of interest without adequate oversight and supervision.

7.      Plaintiffs ask that the Court grant Plaintiffs injunctive relief requiring (a) DOH to supervise the Healthfirst MLTC plans and enforce compliance with the Medicaid Act, the ADA, Section 504 (and their accompanying regulations) and the Due Process clause of the U.S.

Constitution, and (b) the Healthfirst MLTC plans to abide by such direction and to comply with the requirements of the Medicaid Act and its implementing regulations, the ADA and Section 504 (and their implementing regulations) and the New York State Social Services Law and its implementing regulations as they relate to the New York State Medicaid program. N.Y. Soc. Serv. Law §§ 363-369; 18 N.Y.C.R.R. §§ 358, 360, 505, *et seq*. Plaintiffs also ask for a declaration that DOH's acts and omissions represent an unconstitutional delegation of legislative authority, in violation of Article 1 and the Due Process Clause of the U.S. Constitution, and that DOH and the Healthfirst MLTC plans are violating the Medicaid Act, the ADA and Section 504 (and their accompanying regulations).

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the parties and the claims asserted in this action under 28 U.S.C. § 1331, as this case arises under the Constitution and laws of the United States, and 28 U.S.C. § 1343(a)(3)-(4), which confers original federal court jurisdiction over claims to redress the deprivation of civil rights, including claims asserted under 42 U.S.C. § 1983.

9.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims against the Healthfirst MLTC plans under the New York State Social Services Law and its implementing regulations.

10.     Plaintiffs' claims for declaratory relief are brought under 28 U.S.C. §§ 2201, 2202.

11.     Plaintiffs bring this action under 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Medicaid Act and the United States Constitution, including Article I and the Due Process clause of the Fourteenth Amendment. Plaintiffs also bring this action under federal anti-discrimination laws, the ADA, and Section 504.

12.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in this judicial district, and Defendants are subject to personal jurisdiction in this judicial district.

## PARTIES

13.     MADELINE BUCCERI is a ninety-three year-old Medicaid and Medicare recipient who lives alone in Richmond County. She suffers from osteoarthritis, spinal stenosis, anxiety and depressive disorders, hypertension, hyperlipidemia, hypothyroidism, urinary frequency and incontinence, and gastroesophageal reflux. Ms. Bucceri requires assistance with virtually all activities of daily living.

14.     PATRICIA TRUJILLO is a seventy-one year-old Medicaid and Medicare recipient who lives alone in New York County. She suffers from osteoarthritis, joint and back pain, peripheral retinal degeneration, bipolar disorder, depression and anxiety. Ms. Trujillo requires assistance with activities of daily living including walking, bathing, personal hygiene, dressing, toilet transfer and toilet use.

15.     LOURDES LO is a seventy-four year-old Medicaid and Medicare recipient who resides in New York County. She suffers from Parkinson's disease, diabetes, osteoarthritis, neuropathy, urinary incontinence, anxiety disorder and depression. She also has a history of falls. Ms. Lo requires assistance with bathing, personal hygiene, dressing, walking, and toileting.

16.     Defendant HOWARD ZUCKER is the Commissioner of DOH. He is responsible for the administration of the New York State Medicaid program consistent with the Medicaid Act, the ADA, and Section 504. Plaintiffs sue him in his official capacity. His principal office is in Albany, New York. DOH is a public entity within the meaning of the ADA and its

accompanying regulations, including 28 C.F.R. § 35.104. As the recipient of federal funding, DOH is subject to the requirements of Section 504 and its accompanying regulations.

17.     Defendant HF MANAGEMENT SERVICES, LLC is a for-profit entity that sits atop the Healthfirst Enterprise and directly or indirectly owns and controls not only the two Healthfirst MLTC plans (SHP and CompleteCare), but also HF Administrative Services, Inc., Healthfirst, Inc. and Healthfirst Health Plan, Inc. It maintains its principal place of business at 100 Church Street, New York, New York.

18.     Defendant SENIOR HEALTH PARTNERS, INC., which is wholly-owned by Defendant HF Management Services, LLC, operates an MLTC plan. It authorizes Medicaid-funded home care services to eligible Medicaid recipients under a contract with DOH. It maintains its principal place of business at 100 Church Street, New York, New York.

19.     Defendant HF ADMINISTRATIVE SERVICES, INC. is a for-profit corporation that is wholly-owned by Defendant HF Management Services, LLC. It ostensibly provides services to Medicaid recipients enrolled in the Healthfirst MLTC plans and is thus a channel for profits in the Healthfirst Enterprise to percolate up to HF Management Services, LLC. It maintains its principal place of business at 100 Church Street, New York, New York.

20.     Defendant HEALTHFIRST, INC. is a New York corporation that is wholly owned by HF Management Services, LLC, and that wholly owns Defendant Healthfirst Health Plan, Inc., which administers the Healthfirst MLTC plan CompleteCare. It maintains its principal place of business at 100 Church Street, New York, New York.

21.     Defendant HEALTHFIRST HEALTH PLAN, INC. is a New York corporation that is wholly-owned by Healthfirst, Inc. and administers the Healthfirst MLTC plan

CompleteCare. It maintains its principal place of business at 100 Church Street, New York, New York.

## THE LEGAL FRAMEWORK AND HOW DEFENDANTS ARE GUTTING IT

### The Medicaid Program

22.     The Medicaid Act enables each state to furnish medical assistance, partially funded by the federal government, to individuals whose incomes and resources are insufficient to meet the costs of necessary medical services. 42 U.S.C. § 1396a.

23.     States are not required to participate in the Medicaid program, but if they choose to do so, they must comply with federal Medicaid statutes and their implementing regulations. 42 U.S.C. § 1396, 1396a, 1396c.

24.     Participating states also must submit a "state plan" and any amendments to the state plan to the United States Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS") for approval before that state may receive Medicaid funds. 42 U.S.C. § 1396a(a), (b).

25.     The Medicaid Act mandates that a state plan provide for making medical assistance available to all categorically needy individuals by providing medical services. 42 U.S.C. § 1396d(a)(10)(A).

26.     An individual is "categorically needy" and eligible for Medicaid if she falls into one of the eligibility categories set forth in 42 U.S.C. § 1396a(a)(10)(A)(i)(I) – (VII).

27.     Under the Medicaid Act, a state plan "must include reasonable standards for determining eligibility for and the extent of medical assistance under the plan." 42 U.S.C. § 1396a(a)(17).

28.     The Medicaid Act also requires that medical assistance be provided "in a manner consistent with . . . the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

29.     A state must provide that all individuals wishing to make an application for medical assistance shall have opportunity to do so and that such assistance shall be furnished with reasonable promptness to all eligible individuals. 42 U.S.C. § 1396a(a)(8); 42 C.F.R. § 435.930.

30.     Services provided under the Medicaid Act, including home care services, "must be sufficient in amount, duration or scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b).

31.     A participating state must provide its Medicaid plan to the federal government documenting how the state intends to administer its Medicaid plan.

32.     Medicaid recipients have a right to timely and adequate notice of their right to an administrative fair hearing to challenge decisions denying, reducing or terminating their requests for home care services. 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 431.206(b),(c), 431.210, 431.211, 435.919, 435.912, 438.10, 438.210(c), (d), 438.404(b); *accord* N.Y. Soc. Serv. Law §§ 22, 365-a(8); 18 N.Y.R.R. §§ 358-2.2, 358-2.23, 358-3.3.

**New York State Statutory and Regulatory Scheme**

33.     New York has opted into the Medicaid program. Sections 363-369 of the New York Social Services Law, and the regulations promulgated thereunder, prescribe the manner in which the Medicaid program is supposed to be administered in New York. N.Y. Soc. Serv. Law §§ 363-369; 18 N.Y.C.R.R. §§ 358, 360, 505, *et seq*.

34.     DOH is the state agency responsible for the implementation of the State's Medicaid Plan. N.Y. Soc. Serv. Law § 363.

35.     New York Social Services Law § 365-a establishes the coverage and adequacy of medical assistance under the New York State plan for Medicaid. N.Y. Soc. Serv. Law § 365-a.

36.     New York Social Services Law §§ 363 and 364(2)(e) mandate a "comprehensive program of medical assistance for needy persons . . . to operate in a manner which will assure a uniform high standard of medical assistance throughout the state," in such a way "that the quality of medical care and services is in the best interests of the recipients." N.Y. Soc. Serv. Law §§ 363, 364(2)(e).

**Medicaid Managed Care**

37.     Since 1997, New York has operated a Medicaid waiver called the "Partnership Plan" that, in relevant part, requires most Medicaid recipients to enroll in a managed care organization ("MCO") with which DOH has contracted.

38.     MCOs, such as the Healthfirst MLTC plans, are privately-owned and -operated health insurance entities that contract with DOH to provide Medicaid recipients with a package of covered services in exchange for receiving from the state a "capitation" payment per enrollee. 42 U.S.C. § 1396b(m); 42 C.F.R. §§ 438.2, 438.6. All MLTCs are MCOs.

39.     In approving the Partnership Plan, CMS expressly provided that, with the exception of three enumerated provisions of the Medicaid Act not relevant here, "[a]ll requirements of the Medicaid program expressed in law, regulation, and policy statement" continue to apply to New York's Medicaid program. *See* CMS, Partnership Plan Section 1115 Demonstration, Waiver No. 11-W-00114/2, Waiver Authority at 1 (as of Apr. 14, 2014) ("Waiver Authority"), *available at* https://www.health.ny.gov/health_care/medicaid/redesign/docs/2015-10-01_1115_waiver_stcs.pdf.

40.     Enrollees in MCOs are entitled to "access to comprehensive and coordinated health care." MCOs' responsibilities include "management of the medical and health care needs of participants by the participant's designated primary care practitioners or group of primary care practitioners to assure that all services provided under the managed care program and which are found to be necessary are made available in a timely manner, in accordance with prevailing standards of professional medical practice and conduct." N.Y. Soc. Serv. Law § 364-j(4)(j)(1).

**Medicaid Managed Long Term Care Services**

41.     Under the Partnership Plan, Medicaid recipients who: (a) receive Medicare in addition to Medicaid; (b) are eligible for community-based long term care; and (c) are expected to need at least 120 days of such care, must enroll in MLTC plans with which DOH has contracted for the provision of home care services. *See* Waiver Authority at 9.

42.     The services that MLTC plans provide include long term care services collectively referred to as "home care services" that enable Medicaid recipients to live safely in their homes.

43.     Home care services include, at a minimum, the personal care services essential to the maintenance of the patient's health and safety in his or her home, which can include preparing meals, assistance with personal hygiene, toileting, walking and other identified tasks. 42 U.S.C. § 1396d(a)(24); 42 C.F.R. § 440.167; N.Y. Soc. Serv. Law § 365-a(2)(e); 18 N.Y.C.R.R. § 505.14(a)(1), (a)(6)(ii)(a).

44.     Home care services also include full- or part-time nursing, home health aide services, medical supplies, and home-based physical therapy. 42 U.S.C. § 1396d(a)(7); 42 C.F.R. § 440.70; N.Y. Soc. Serv. Law § 365-a(2)(d); 18 N.Y.C.R.R. § 505.23; 10 N.Y.C.R.R. § 763.5.

45.     All MLTC plans are MCOs. There are two types of MLTC plans: partially-capitated and fully-capitated.

46.     SHP is a partially-capitated MCO, meaning that it contracts with DOH to provide certain Medicaid-funded services, including home care services.

47.     Healthfirst Health Plan, Inc.'s CompleteCare is a fully-capitated MLTC plan, meaning that it contracts with DOH to provide all Medicaid-funded and Medicare-funded services, including home care services.

48.     Both partially- and fully-capitated MLTC plans receive a fixed amount of funding per enrollee without regard to the number of home care services they provide. *See* N.Y. Pub. Health Law § 4403-f.

49.     Thus, the Healthfirst MLTC plans' financial incentive is to minimize the number of hours of home care that it provides to enrollees so as to maximize profits.

50.     Federal regulations require that contracts between MLTCs, such as the Healthfirst MLTC plans, and the responsible state agencies contain certain terms, including requirements that MLTC plans comply with all applicable laws. 42 C.F.R. §§ 438.206, 438.210(a).

51.     Additionally, state contracts with MLTCs must "specify what constitutes 'medically necessary services' in a manner that is no more restrictive than that used in the State Medicaid program as indicated in State statutes and regulations, the State Plan, and other State policy and procedures." 42 C.F.R. § 438.210(a)(4)(i). Under their contracts with DOH, MLTCs provide care and services to adult recipients of Medicaid and Medicare who need more than 120 days of long term care services and meet other eligibility requirements. *See* MLTC Partial Capitation Model Contract ("MLTC Model Contract") at 15, *available at* https://www.health.ny.gov/health_care/medicaid/redesign/docs/mrt90_partial_capitation_model. pdf; Medicaid Advantage Plus (MAP) Model Contract ("MAP Model Contract") at 33, *available at*

https://www.health.ny.gov/health_care/medicaid/redesign/docs/mrt90_medicaid_adv_plus_mode
l_contract.pdf.

52.     DOH's contracts with MLTC plans specify that the contractors must comply with
Title II of the ADA and Section 504 for program accessibility as well as the New York City
Human Rights Law. *See* MLTC Model Contract at 6 and Appendix B, MAP Model Contract at
19, 91 and Appendix J.

53.     An additional condition for eligibility of enrollment in a fully-capitated MLTC
such as CompleteCare is that the individual must require a nursing home level of care.  *See* MAP
Model Contract at 33;  *see also* MLTC Policy 13.03(A), *available at*
https://www.health.ny.gov/health_care/medicaid/redesign/docs/mltc_policy_13-03a.pdf.

**<u>Assessments</u>**

54.     DOH mandates two levels of assessment when determining eligibility for home
care services. The first is a threshold eligibility assessment to determine whether beneficiaries
meet the requirements for MLTC enrollment (the "Eligibility Assessment").

55.     The Eligibility Assessment is conducted by the "Conflict-Free Evaluation and
Enrollment Center" to determine whether beneficiaries require more than 120 days of home care
and may be safely maintained in the community. MLTC Policy 14.06, *available at*
https://www.health.ny.gov/health_care/medicaid/redesign/docs/mltc_policy_auth_14.06.pdf. *See*
N.Y. Pub Health Law § 4403-f(7)(g)(i). As its name implies, this evaluation is conducted by an
organization which – unlike the Healthfirst MLTC plans – does not have a financial interest that
conflicts with the applicants' home care needs.

56.     Once the Eligibility Assessment finds a Medicaid beneficiary eligible for MLTC
enrollment, she must then apply to a specific MLTC plan to actually receive home care. The

second assessment is conducted by the MLTC plan to determine the quantity and type of home care services the individual needs (the "MLTC Assessment"). MLTC Policy 14.04, *available at* https://www.health.ny.gov/health_care/medicaid/redesign/docs/mltc_policy_nursing_home_asse ss_v2.pdf.

57.     Enrollment in an MLTC plan occurs after the plan has conducted its initial assessment and agreed to authorize services.

58.     The Healthfirst MLTC plans make decisions about enrollees' needs for care through an assessment process in which a registered nurse goes to the home of an enrollee to examine the enrollee and ask questions.

59.     As part of the assessment, the nurse generally completes at least three specific documents.

60.     Those three documents are the Uniform Assessment System ("UAS"), a Supplemental Nursing Assessment ("SNA") and an Aide Task Service Plan ("ATSP").

61.     The UAS is a form created by DOH, to be completed by an assessing nurse, that is intended to represent a comprehensive assessment of an individual's medical condition and need for assistance.

62.     The SNA is a Healthfirst form intended to supplement the UAS. It largely duplicates the UAS, but also captures information regarding an enrollee's social circumstances, such as the enrollees' informal caregivers.

63.     The ATSP is also a Healthfirst form. It breaks down tasks by day and by minute so that the assessing nurse can hypothetically determine how much time it will take to perform each task per day and per week.

64.     A Healthfirst medical director later reviews these three forms to render a decision about the amount of care to authorize.

65.     This same assessment process is used for initial determinations, reauthorizations and assessments that are the result of a request for an increase in home care hours.

66.     DOH does not create or authorize two of these tools that the Healthfirst MLTC plans use to determine the number of hours they will authorize for an enrollee. Thus, the Healthfirst MLTC plans are engaging in unsupervised rule-making in using these tools.

67.     The Healthfirst Enterprise and its MLTC plans are exploiting this vacuum and using their rule-making tool as a key weapon to improperly reduce or deny home care services to Medicaid recipients, in violation of the Medicaid Act.

**Procedures for Requesting Additional Services from Healthfirst MLTC Plans**

68.     DOH sets threshold requirements for eligibility to enroll in an MLTC plan, but DOH permits the Healthfirst MLTC plans unlimited discretion to create their own rules and methods for processing enrollees' requests for services and determining the level of services to be provided. The Healthfirst MLTC plans are using this unlimited discretion – the ability to engage in their own rule-making, in effect – to thwart clear legal requirements of the Medicaid Act and New York State law. They are denying services to Plaintiffs in at least four distinct and systematic ways: (1) they ignore requests for increased services,  do not record those requests and/or deny them without affording recipients notice of their rights to challenge the denial; (2) they use a task-based assessment tool that arbitrarily limit the services provided, with no connection to the enrollees' actual needs; (3) they by-pass the requirement to conduct the threshold determination of whether an enrollee needs twenty-four hour services, using only the

task-based assessment tool instead, in violation of state regulations; (4) they deny or limit services by relying on a façade of "voluntary" caregivers.

69.     An MLTC plan must authorize the hours of home care services that its enrollees receive, but authorizations cannot exceed six months. 18 N.Y.C.R.R. § 505.14(b)(5). The duration of the authorization period must be based on the individual's needs. In determining the duration of the authorization period, the MLTC plan must consider the individual's prognosis and potential for recovery, the expected length of any informal caregivers' participation in caregiving, and the projected length of time that alternative services will be available. *Id.*

70.     Enrollees may request an increase in the number of home care hours for which they are currently authorized when the plan's current authorization is not meeting their needs. A request for home care services in addition to those currently being provided is known as a "concurrent review." *See* MLTC Model Contract, Appendix K, section 3; MAP Model Contract, Appendix F, section 1.

71.     State regulations also require MLTC plans to make service changes on a timely basis when an unexpected change has occurred that would affect the type, amount or frequency of home care services required during an authorization period. 18 N.Y.C.R.R. § 505.14(b)(5).

72.     When an enrollee's request for an increase is the result of a change in her medical condition, the MLTC plan must conduct a re-assessment.

73.     The contract between DOH and MLTC plans requires plans to decide an enrollee's request for an increased number of home care hours within fourteen days of receipt of necessary information, unless the plan or provider determines that the enrollee's medical condition warrants an expedited review, in which case the review must be conducted within three days of receipt. MLTC Model Contract, Appendix K, section. 3; MAP Model Contract,

Appendix F, section 3. State regulations define reasonable promptness as providing services no more than seven days after completion of assessment. 18 N.Y.C.R.R. §505.14(b)(4)(iv).

74.     DOH does not require the Healthfirst MLTC plans to have a system that records or provides confirmation of enrollees' requests for services or concurrent reviews. As a result, requests for increased home care are frequently ignored. For example, Ms. Trujillo has repeatedly requested weekend home care hours, but CompleteCare has either ignored her requests or told her that she may not make these requests. Ms. Bucceri's advocate requested an increase in home care hours for her, but when she followed up on the request, SHP stated that they had no record of her request.

75.     All class members have impairments that affect their ability to engage in activities of daily living. All class members have impairments that affect their physical stamina, and many have impairments that affect their ability to remember. All class members have medical needs that are subject to change in unpredictable ways. Here, while the Healthfirst MLTC plans do permit class members to communicate requests for additional services by phone, the plans do not consistently document these requests or provide class members with confirmation of receipt of these requests. Thus, disabled class members are forced to make repeated requests for increased services – never knowing whether the plans will record or act on the request. Requiring disabled clients – many of whom have impairments that affect their stamina and cognitive abilities – to repeatedly make the same requests for additional hours of care is a method of administration that has the effect of subjecting these qualified individuals to discrimination on the basis of their disabilities. This method also has the effect of harming Plaintiffs by unlawfully reducing the amount of services that the Healthfirst MLTC plans are providing and defeating or substantially

impairing accomplishment of the objectives of the Partnership Plan and community-based long term care for disabled individuals.

**Flawed Task-Based Assessment Tool**

76.     The Healthfirst Enterprise and Healthfirst MLTC plans have designed their task-based assessment tool to assign task times that fail to recognize the actual individual needs of an enrollee and the span of time it realistically takes to complete a task. This allows them to gut enrollees' Medicaid benefits by improperly reducing the amount of hours of services they provide. For example, SHP's rule-making tool allows only fifteen minutes for Ms. Lo to bathe and only twenty minutes for Ms. Lo to dress when it typically takes her twice as long.

77.     The law requires MLTCs to take into account whether an enrollee's needs can be scheduled or if they "may occur at unpredictable times during the day or night." DOH Office of Medicaid Management, General Information System, Jan. 24, 2003 (03/MA/003), *available at* https://www.health.ny.gov/health_care/medicaid/publications/docs/gis/03ma003.pdf.

78.     The Healthfirst MLTCs' arbitrary assessment tool runs roughshod over this rule, relying on a patient-as-robot model and determining enrollees' hours of home care services based on an assumption that all services can be scheduled and performed at interchangeable times. This allows the Healthfirst MLTC plans to unlawfully reduce the amount of home care hours it authorizes for enrollees, as compared to the hours of services they actually need and should be receiving.

79.     Thus, for example, when a recipient needs assistance with toileting on an unscheduled basis throughout the day, the Healthfirst MLTC plans use their rule-making tool to ignore the enrollee's actual medical needs and the span of time during which she requires assistance and instead assign an arbitrary amount of time for toileting during the course of a day

– regardless of *when* those needs occur. If, for example, the Healthfirst MLTC plans' tool were to conclude that an enrollee requires toileting assistance in eight instances for a cumulative total of two hours per day, the plans would authorize only a single two-hour block of service hours per day, as if the enrollee could do all of her toileting during a selected two-hour block of time, rather than throughout the day. In at least one case, the Healthfirst MLTC used its tool to conclude that a severely disabled wheelchair-bound recipient needed assistance with toileting – but only every other day.

80.     DOH looks the other way and does not monitor or supervise the Healthfirst MLTC plans' use of this arbitrary rule-making tool. DOH allows the plans to base their determinations on an arbitrary fiction that the tool spits out, rather than the enrollee's actual needs, thwarting DOH's directive that determinations must assess whether an enrollee's needs may be scheduled or are unpredictable.

81.     Upon information and belief, DOH does not even require the MLTC plans to submit their assessment tools and any changes to them for approval.

82.     DOH has effectively enabled the Healthfirst MLTC plans to make their own Eligibility rules, in violation of the enrollees' rights under the Medicaid Act, but in line with the financial interests of the Healthfirst Enterprise.

**Failure to Conduct Required Twenty-Four Hour Care Assessments**

83.     The Healthfirst MLTCs' flawed task-based assessment tool is not the only weapon that the Healthfirst Enterprise is wielding to gut the Medicaid benefits of the State's vulnerable Medicaid recipients.

84.     Under state regulation, an MLTC plan must make a threshold determination if an enrollee is medically eligible for twenty-four hour home care services before using any rule-

making assessment tool to determine the enrollee's authorization for services. 18 N.Y.C.R.R §
505.14(a)(3)(iii)(b).

85.     When an enrollee has been determined to be in need of twenty-four hour care,
MLTC plans may not base their determination of authorized home care services upon a task-
based assessment tool. 18 N.Y.C.R.R. § 505.14(b)(5)(v)(d).

86.     The Healthfirst MLTC plans ignore this threshold requirement, never considering
whether their enrollees are entitled to twenty-four hour home care services. The result is that
many enrollees who are eligible for twenty-four hour care are instead parceled out far fewer
hours based on the flawed, automated, patient-as-robot assessment tool used by Healthfirst
MLTC plans.

87.     DOH does not monitor or supervise whether the Healthfirst MLTC plans are
performing this critical threshold determination.

**Creating a Façade That Services Are Being Provided by "Voluntary" Caregivers**

88.     The creation of fictions that voluntary caregivers are providing services to
enrollees is another weapon that the Healthfirst MLTC plans employ to deprive enrollees of their
rights under the Medicaid Act.

89.     In determining the level of home care services an enrollee may receive, MLTC
plans are prohibited from requiring informal caregivers, such as family members or friends, to
provide care to enrollees: "the contribution of family members or friends is voluntary and cannot
be coerced or required in any manner whatsoever." *See* DOH Office of Health Insurance
Programs, Administrative Directive, Apr. 9, 2012 (12 OHIP/ADM-1), *available at*
https://www.health.ny.gov/health_care/medicaid/publications/adm/12adm1.htm.

90.     The Healthfirst Enterprise and Healthfirst MLTC plans flout these rules by effectively coercing contributions from the enrollees' family members and friends or ignoring the real facts about their availability, while DOH looks the other way.

91.     Despite its Administrative Directive, DOH has not prescribed any formal procedures through which an MLTC plan must document and determine (a) that informal providers are actually available to provide care during the times in which the MLTC plan deems their labor to be substituted for services that the MLTC plan would otherwise be required to provide and pay for, (b) that the informal providers' contribution to the enrollee's care is entirely voluntary, (c) that the enrollee understands that her care will not be reduced if she does not identify voluntary informal care providers, and (d) that all needs for care are documented – even during hours for which informal care is currently being provided.

92.     For example, the ATSP for Ms. Trujillo states that she requires no assistance on the weekends when it is clear that in fact she needs care during the weekend. Ms. Trujillo was not given an opportunity to review the ATSP before it was submitted for processing. As a result, the Healthfirst Enterprise determination that she did not need the care during the weekend hours was based on the entirely false premise that voluntary care was available to her when it was not.

93.     The Healthfirst MLTC plans also fail to document the care that informal caregivers are providing to enrollees. This failure results in enrollees being forced to endure gaps in coverage when informal caregivers are unavailable and delays while an enrollee waits to be re-evaluated for care for which there already was a clearly documented need.

94.     Once again, the Healthfirst Enterprise and Healthfirst MLTC plans are exploiting a DOH vacuum to create their own rules that favor their financial interests, at the expense of the rights of their enrollees under the Medicaid Act. DOH's lack of oversight and monitoring of the

plans' practices for claiming that informal caregivers are in place results in coercive assessments in which the plans ultimately conclude that the supposedly voluntary services of the enrollees' family member and friends may be substituted for the services the plans are required to provide. The Healthfirst Enterprise and Healthfirst MLTC plans are using DOH's lack of oversight to hide their coercive and leading tactics in creating a fiction that these informal services are in place to protect their enrollees.

95.     A process with minimum administrative burdens, requiring simply that enrollees and their family or friends be told they do not have to volunteer, that care hours will not be reduced if enrollees cannot find family or friends to volunteer, and documenting that any volunteers are actually available during the hours that the MLTC is relying on them to meet the care needs, would avoid the errors and abuse reflected in cases such as that of Ms. Trujillo, who has been deprived of the care she is entitled to receive due in part to this lack of process.

**Fair Hearing Outcomes Suggest Systemic Violations**

96.     The combined effect of all of the tactics described above has redounded to the substantial financial benefit of the Healthfirst Enterprise and Healthfirst MLTC plans. Many enrollees in Healthfirst MLTC plans cannot get the services to which they are entitled based on their medical needs, resulting in the need for these vulnerable individuals to challenge the determinations through an appeals process that is difficult to navigate.

97.     If the MLTC plan does not grant an enrollee's request for additional hours of home care services, the enrollee can request – in addition to a fair hearing – an internal appeal with the MLTC plan. This appeal can be expedited upon the request of either the MLTC plan or the enrollee, when either believes that a delay would seriously jeopardize the enrollee's life or

health or ability to attain, maintain or regain maximum function. MLTC Model Contract, Appendix K, § 3; MAP Model Contract, Appendix F, § 3.

98.     Whenever an MLTC plan renders a decision that is adverse to an enrollee, it must send a written notice to the enrollee explaining the action, the right to appeal, the procedures for appealing and how to request expedited resolution. 42 C.F.R. § 438.404(a); *see* 42 C.F.R. § 438.400(b).

99.     When determinations are made to deny, reduce, or terminate Medicaid benefits, applicants and recipients must be given timely and adequate notice of their right to a State administrative "fair hearing." 42 U.S.C. § 1396a(a)(3); 42 C.F.R. §§ 435.919, 435.912, 431.206(b), 431.206(c), 431.210; N.Y. Soc. Serv. Law § 22(12); 18 N.Y.C.R.R §§ 505.14(b)(5)(v), 505.14(g)(3)(x).

100.    A review of fair hearing decisions for disabled Medicaid recipients enrolled with SHP shows that SHP has a record of frequently having their home care hour determinations overturned through the State-administered fair hearing process.

101.    The review shows that over one hundred individuals requested a fair hearing following SHP's denials of their requests for increases. The review searched all fair hearing decisions between June 1, 2015 and July 18, 2016 using the keywords "personal care," "Senior Health Partners" and "increase."

102.    The review shows that roughly only 20% of the denials by SHP were upheld on appeal: of 135 cases reviewed where appellants filed for a fair hearing to overturn SHP's denial of their requests for increases, administrative law judges reversed ninety denials and upheld only twenty-six denials. The nineteen remaining cases not upheld or reversed ended with a stipulation between SHP and the appellant resulting in an increase in hours.

103.    The review also reveals the troubling fact that, in sixteen of the cases in which a disabled enrollee challenged a denial of a request for an increase in home care hours, SHP had responded to these requests by instead *decreasing* the number of hours the enrollee had been receiving. In eight of these cases, the Administrative Law Judge reversed the decision to reduce or discontinue care, and in the eight others, SHP agreed (after being challenged) not to reduce or discontinue care.

104.    Medicaid recipients such as the class members here who request additional hours of home health care from the Healthfirst MLTC plans risk that doing so will result in the plans' reducing the amount of care they currently have. In the face of these retaliatory tactics, DOH has again looked the other way.

105.    These fair hearing decisions represent a fraction of the instances in which the Healthfirst MLTC plans have employed the strategies and practices outlined above, because the number of Medicaid recipients who fail to use the fair hearing process swamps the number of Medicaid recipients who turn to it. The class members here are a vulnerable, needy and indigent population, all of whom require home care services to remain safely in their homes. By definition, they cannot manage alone and have serious, often multiple, medical conditions. Challenging the determinations of a large, well-heeled corporate enterprise such as the Healthfirst Enterprise is seen as a daunting, if not impossible, task, as most cannot afford to hire a lawyer, and free legal services for such an indigent population are scarce. Thus, the results of the review discussed above represent the tip of the iceberg as to the impact that the Healthfirst MLTC plans' wrongful terminations, denials and reductions have had on class members.

**DOH's Failure to Oversee and Monitor the Healthfirst MLTC plans**

106. DOH retains the responsibility to ensure that the rights of Medicaid recipients enrolled in MLTC plans are protected. 42 C.F.R. § 438.100(a), (d). To that end, federal law requires DOH to supervise the activities of MLTCs, including by auditing the MLTCs' records and patient files, to ensure that Medicaid-funded services are being provided to New Yorkers. *See, e.g.*, 42 C.F.R. §§ 438.204(b), 438.416, 438.228(b).

107. DOH is failing to fulfill its duties to monitor and supervise the Healthfirst MLTC plans, and has looked the other way as the Healthfirst MLTC plans employ practices that gut the Medicaid benefits of the State's vulnerable Medicaid recipients.

108. DOH is abdicating the authority that Congress and the New York Legislature delegated to it to operate New York's Medicaid program in accordance with federal and state law and is instead improperly delegating that rule-making to a private enterprise that is looking out for its own financial interests. DOH has effectively and improperly delegated legislative and rule-making authority despite the federal and state mandate that home care services and other medical assistance be provided "in a manner consistent with . . . the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

**Federal Laws Prohibiting State and MLTC Disability Discrimination**

109. The ADA was enacted to "eliminate discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

110. Title II of the ADA prohibits discrimination against individuals with disabilities by any public entities, including state and local governments, their departments, and agencies. 42. U.S.C. §§ 12131,12132. "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs,

or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §
12132; 28 C.F.R. §§ 35.130(b)(1)(iv), 35.130(b)(7)-(8), and 35.130(d).

111.    The ADA prohibits unnecessary segregation of people with disabilities into
institutions – that is, disability ghettos – and requires services, programs and activities of state
and local governments to be administered in "the most integrated setting appropriate to the needs
of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

112.    The "most integrated setting" means one that "enables individuals with
disabilities to interact with nondisabled persons to the fullest extent possible . . . ." 28 C.F.R. §
Pt. 35, App. A (2010). *See also* Statement of the Department of Justice on Enforcement of the
Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.,*
*available at* http://www.ada.gov/olmstead/q&a_olmstead.htm (hereinafter "DOJ Olmstead
Guidance").

113.    The ADA protects disabled persons whom the state or its designees (e.g., the
MLTC plans) have placed at serious risk of unnecessary segregation and institutionalization by
their acts or omissions. A disabled person need not suffer the actual harm of segregation or
institutionalization before seeking relief under the ADA. *Id.*; *see also* 28 C.F.R. § 35.130(d) ("A
public entity shall administer services, programs, and activities in the most integrated setting
appropriate to the needs of qualified individuals with disabilities.").

114.    The regulations implementing the ADA require state governments and their
agencies and designees to make reasonable modifications to policies, practices and procedures to
protect against discrimination on the basis of disability and to ensure services are provided in the
most integrated setting appropriate to the needs of individuals with disabilities. *See* 28 C.F.R. §
35.130(b)(7); *see also* 28 C.F.R. § 35.130(d).

115.    Section 504 achieves much the same purposes as Title II of the ADA. It prohibits discrimination against individuals with disabilities by any program or activity, including any department or agency of a State government receiving federal financial assistance. 29 U.S.C. § 794(a), (b). "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794; 45 C.F.R. §§ 88.4(a), 88.4(b)(1)(i), (iv), (vii); 84.4(b)(2); 84.52(a)(1), (4), (5).

116.    Section 504 also prohibits the unwarranted segregation of people with disabilities and requires services, programs and activities of state and local governments to be administered in "the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d).

117.    Section 504 requires federally-funded state governments and their agencies and designees (e.g., MLTCs) to make reasonable modifications to policies, practices, and procedures to ensure disabled persons are not relegated to disability ghettos. *See* 29 U.S.C. § 794(a).

118.    The regulations implementing the ADA and Section 504 also specify that state governments and their agencies and designees may not directly, or through contractual or other arrangements, utilize criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities. 28 C.F.R. § 35.130(b)(3) and 45 C.F.R. § 84.52(a)(4).)

# THE INDIVIDUAL PLAINTIFFS

## Madeline Bucceri

119.    Ms. Bucceri is a ninety-three year-old Medicaid and Medicare recipient who lives alone in Staten Island, New York. She suffers from a number of medical conditions including osteoarthritis, spinal stenosis, hypertension, anxiety and depressive disorders, and urinary frequency and incontinence. She needs assistance with all activities of daily living but receives only thirty-three hours of home care hours per week. Ms. Bucceri has repeatedly requested additional home care hours and has repeatedly been denied the medically necessary care she requires to remain safely in her home where she has lived for twenty-six years.

120.    Ms. Bucceri worked most of her life. For many years, she owned and operated a hair salon in Bensonhurst. In 1990, she sold her salon and moved to a studio apartment in Staten Island, where her siblings lived. She has lived in her apartment ever since. All of her family has passed, and she does not have any family or friends to assist with her daily living activities. Ms. Bucceri was able to take care of herself until she was approximately ninety-one years old, when she began to suffer pain and limited mobility due to osteoarthritis.

121.    In July 2015, Ms. Bucceri began receiving home care services through SHP. As of May 2016, she received four hours of home care services on four days of the week and five hours of home care services on the remaining three days of the week for a total of thirty-one hours per week.

122.    In May 2016, when Ms. Bucceri's hip and leg pain increased and she started to have more difficulty walking, she called The Legal Aid Society for assistance requesting additional hours of home care services. On or about May 24, 2016, Ms. Bucceri's counsel called SHP to request additional hours. SHP replied that it would contact the member about her needs.

123.    On or about June 2, 2016, more than a week after counsel requested additional

hours on Ms. Bucceri's behalf, SHP called Ms. Bucceri to ask some questions, but did not send a

representative to her house to conduct an assessment, in violation of the terms of SHP's contract

with DOH.

124.    SHP did not increase Ms. Bucceri's home care service hours.

125.    On June 6, 2016, while unattended, Ms. Bucceri fell while walking to the

bathroom. She was taken by ambulance to the emergency room and was hospitalized to rule out

the possibility of a fractured hip. Ms. Bucceri was discharged from the hospital on June 10, 2016.

126.    Sometime after being discharged from the hospital, Ms. Bucceri received a call

from SHP. She was told that a nurse would do a home assessment on June 27, 2016 – three and a

half weeks after SHP's initial call to her following counsel's request for increased hours of care.

127.    Several days before the June 27, 2016 assessment was to have taken place, Ms.

Bucceri was again hospitalized, this time for uncontrolled pain, and she remained in the hospital

for three weeks.

128.    While Ms. Bucceri was in the hospital, the Case Management Nurse for the

Department of Rehabilitation Medicine at Staten Island University Hospital called SHP to

request that the plan send someone to the hospital to assess Ms. Bucceri for an increase in home

care hours prior to her discharge, so that she could safely remain in her home and community.

The hospital nurse requested that Ms. Bucceri be given ten hours of home care services per day

for a total of seventy hours per week, a thirty-nine hour increase from the thirty-one hours SHP

had allotted to Ms Bucceri. SHP came to the hospital on July 12, 2016 and performed an

assessment but did not then authorize any increase in services.

129.    In a letter dated July 13, 2016, SHP denied Ms. Bucceri's request for an increase in home care services to ten hours per day. SHP said that it would provide Ms. Bucceri with only two additional hours of home care services *per week* for a total of thirty-three hours, rather than the seventy hours recommended by the hospital Case Management nurse.

130.    Ms. Bucceri was discharged on July 14, 2016.

131.    On July 30, 2016, while at home and unattended (having been denied the home care services she requested), Ms. Bucceri fell again while reaching for her walker. She did not call for an ambulance and was evaluated at home by the nurse assigned to her by her home care vendor agency.

132.    Ms. Bucceri's pain has recently increased substantially. As a result, Ms. Bucceri was prescribed Codeine, with the caveat that it might cause dizziness. Initially, Ms. Bucceri was afraid to take the medication because she is alone so many hours of the day, but she recently took the medication and reported feeling "drugged" and unwell. Accordingly, she has not taken the medication again and remains in constant pain because of SHP's denial of the home care services she requested.

133.    The frequency of Ms. Bucceri's need to urinate has also recently increased.

134.    On September 8, 2016, counsel for Ms. Bucceri contacted SHP and requested an increase in home care hours on an *expedited* basis, which must be decided within three business days of the request. Counsel explained that the reason for the expedited request was Ms. Bucceri's worsening condition, which included increased and uncontrolled pain and urinary frequency, which together have resulted in incontinence because of her delays in getting to the bathroom. SHP told counsel that they would contact Ms. Bucceri.

135.    On or around September 20, SHP denied the September 8, 2016 request.

136.    Because of the limited number of home care hours SHP has approved, Ms. Bucceri's personal care assistant leaves at 1 p.m. or 2 p.m., and Ms. Bucceri remains unattended and at risk for many hours of the day. She must even change into pajamas in the early afternoon, since she cannot change her clothes without assistance.

137.    As a result of Healthfirst's failure to provide her with the home care hours she needs, Ms. Bucceri has suffered physical pain, emotional harm and a loss of dignity.

138.    Without additional home care hours to assist her with basic activities of daily living such as toileting, walking, bathing and dressing, Ms. Bucceri will likely continue to fall, incur unnecessary pain and bodily injuries and suffer emotional harm. She is also at serious risk for institutionalization in a segregated setting such as a nursing home, even though she is capable of living in the community, in her home, if she were provided with the home care services that she needs.

**<u>Patricia Trujillo</u>**

139.    Ms. Trujillo is a seventy-one-year-old Medicaid and Medicare recipient who lives alone in Manhattan, New York. She is diagnosed with several chronic conditions including osteoarthritis, gait abnormality, joint pain, lumbago, chronic migraines, cervical spondylosis, bipolar disorder, depression, anxiety, memory loss, glaucoma with ocular trauma, peripheral retinal degeneration, cataracts, dry eye syndrome, endocrine disorder, allergies, irritable bowel syndrome, constipation, and gastroesophageal reflux. Ms. Trujillo requires assistance with activities of daily living including walking, bathing, personal hygiene, dressing, toilet transfer and toilet use.

140.    She currently receives eight hours of home care services Monday through Friday, for a total of forty hours per week. She receives no services on the weekend and her Healthfirst MLTC plan has repeatedly refused to take her request for weekend hours.

141.    Ms. Trujillo has lived in her apartment for approximately twenty-five years. She has lived alone since 2004 when her partner passed away.

142.    Ms. Trujillo has no family or friends to assist her with daily living activities. Ms. Trujillo has siblings who live in New York, but her family has never been available to assist her with daily activities. In fact, she very rarely speaks to or sees her siblings. Ms. Trujillo is transgender and her family has never been supportive of her gender identity.

143.    Ms. Trujillo receives significant social work support from Bill Mendez at SAGE, a services and advocacy organization for gay, lesbian, bisexual and transgender elders. She also receives occasional help from members of her church.

144.    Ms. Trujillo was able to care for herself until her osteoarthritis worsened several years ago.

145.    She enrolled in CompleteCare, Healthfirst Health Plan Inc.'s Medicaid Advantage Plus Plan, with the assistance of SAGE.

146.     She began to receive twenty hours of home care services per week, and never received weekend hours. Over the years, Ms. Trujillo has told CompleteCare that she needs weekend hours, but they have refused to act on this request. Ms. Trujillo did not receive confirmation numbers or receipts for these requests and did not receive written determinations regarding these requests. Recently, her symptoms from osteoarthritis have worsened and she began to press her request for weekend hours more forcefully.

147.    Currently, Ms. Trujillo's home attendant prepares food during the week for her to heat up as necessary when she is alone. Ms. Trujillo eats this food during the weekend and, when necessary, asks a friend from church to bring her food. During the weekends, Ms. Trujillo's home attendant calls to remind her to take her medication, even though the attendant is off duty and not being paid for this task, as CompleteCare has refused to provide weekend services.

148.    While unattended, Ms. Trujillo has fallen in her home several times. She has not sought medical attention for any of these falls.

149.    CompleteCare has never completed an assessment of Ms. Trujillo within the six month maximum time period required by state regulation. Ms. Trujillo's most recent assessment was on April 1, 2016.

150.    At the April 1, 2016 assessment, Ms. Trujillo informed the CompleteCare assessor that she needed an increase in home care hours because she needed weekend hours. The CompleteCare assessor responded, "We're not here for that." CompleteCare not only denied her request for increased weekend hours, but also issued a determination to cut her hours in half from forty hours to twenty hours per week, explicitly citing care from family members that is actually non-existent and failing to report accurately on Ms. Trujillo's circumstances.

151.    The reports from the April 1, 2016 assessment find that Ms. Trujillo needs assistance with meal preparation, housework, managing finances, stairs, shopping, transportation, equipment management, bathing, personal hygiene, dressing, walking, toilet use, and toilet transfer. The UAS report notes that Ms. Trujillo has an unsteady gait, walks with a cane and at times needs to be assisted by a person to walk. The nurse assessor notes that Ms. Trujillo's osteoarthritis and related pain limit her ability to elevate her arms, bend, or stand up for long periods of time.

152.     The UAS report falsely states that Ms. Trujillo has not had a recent fall. The assessor did not ask Ms. Trujillo if she had recently fallen.

153.     The reports indicate that the nurse assessor instructed Ms. Trujillo on the importance of compliance with her medication to treat her bipolar disorder. The nurse assessor also noted that Ms. Trujillo requires reminders for her medications and that her home attendant is currently providing those reminders, even though CompleteCare has refused to authorized that assistance on weekends.

154.     The UAS report falsely states that Ms. Trujillo has strong and supportive relationships with her family. The report also falsely states that her sister has provided informal help during the last three days and is available to continue providing informal assistance on the weekends.

155.     As stated, Ms. Trujillo has a strained relationship with her family. She rarely sees her sister, and her sister does not help her on the weekends. On the day of the assessment, Ms. Trujillo specifically requested weekend home care hours.

156.     The April 1 UAS report stated that there had been no change in Ms. Trujillo's self-sufficiency or her ability to perform activities of daily living. Nonetheless, on April 26, 2016, CompleteCare issued a notice proposing to cut her home care hours in half – from forty hours to twenty hours per week. The reason stated for the proposed reduction was to correct a mistake found in the previous authorizations.

157.     Ms. Trujillo requested an internal plan appeal and a fair hearing to challenge the determination to reduce her home care hours. In response to the internal plan appeal, on June 21, 2016, CompleteCare called Ms. Trujillo and offered to reduce her hours to thirty hours per week,

rather than to the twenty hours per week indicated in the initial reduction notice. Ms. Trujillo did not accept the offer of a reduction to thirty hours per week.

158.    On July 19, 2016, The Legal Aid Society represented Ms. Trujillo at her fair hearing to challenge the reduction of her home care hours.

159.    On August 4, 2016, Bill Mendez called CompleteCare on Ms. Trujillo's behalf and requested an increase in her home care hours to address her need for weekend hours. Mr. Mendez spoke with Ms. Trujillo's nurse care manager, who told Mr. Mendez that she did not know if Ms. Trujillo could request an increase while a fair hearing decision was pending. The nurse care manager said she would look into it and get back to him.

160.    Four days later on August 8, 2016, Ms. Trujillo's nurse care manager called Mr. Mendez and informed him that she had spoken with her supervisor and that CompleteCare does not accept a request for an increase in home care hours while a fair hearing decision is pending, which is violation of the Medicaid Act. CompleteCare did not send a written notice of its denial of Ms. Trujillo's request, which, by definition, includes a failure to provide her with notice of her rights to appeal CompleteCare's denial.

161.    On the same day, August 8, 2016, the Office of Temporary and Disability Assistance issued a decision on Ms. Trujillo's fair hearing challenging CompleteCare's decision to reduce her hours from forty to twenty per week. The fair hearing decision ordered CompleteCare to continue authorizing Ms. Trujillo to receive forty hours of home care services per week.

162.    The fair hearing decision found that CompleteCare's notices were inadequate and its decision to reduce her hours was incorrect. The decision also notes that CompleteCare's ATSP form is flawed because it arbitrarily sets limits on the amount of time required to

accomplish certain tasks and it does not allow assessors to use their discretion to include additional hours of service where such hours are medically necessary. The decision also dismissed CompleteCare's assertion that its decision to reduce Ms. Trujillo's hours was made to merely correct a "mistake" it had made in its prior assessment. The ALJ noted that CompleteCare's "mistake" was in fact a change it had made to its ATSP tool, which resulted in fewer home care hours for Ms. Trujillo – *not* because Ms. Trujillo's health had actually improved.

163.    The ATSP also did not correctly quantify Ms. Trujillo's medical needs, because it left weekends blank as though Ms. Trujillo did not have any medical needs on the weekends.

164.    As a result of CompleteCare's failure to provide her with home care services she needs on weekends, Ms. Trujillo has suffered physical pain, emotional harm and a loss of dignity.

165.    Based on CompleteCare's own assessment, Ms. Trujillo's medical needs qualify her for fifty-six hours of home care services per week, including eight hours per day on Saturday and Sunday when there are no available "voluntary" services from family or friends that can meet her indisputable need for care. Without additional home care hours to assist her with basic activities of daily living such as toileting, walking, bathing and dressing, Ms. Trujillo will likely continue to fall, incur unnecessary pain and bodily injuries and emotional harm. She is also at serious risk for institutionalization in a segregated setting such as a nursing home, even though she is capable of living in the community, in her home, if she were provided with the home care services that she needs.

**Lourdes Lo**

166.    Lourdes Lo is a seventy-four year old Medicaid and Medicare recipient who resides in New York County. She has lived in her home for forty-six years. She suffers from a number of medical conditions including Parkinson's disease, diabetes, neuropathy, osteoarthritis, urinary incontinence, anxiety disorder and depression. She also has tremors, an unsteady gait and a history of falls.

167.    Ms. Lo is enrolled with SHP, which since approximately 2014 has authorized her to receive thirty-nine hours of home care services a week.

168.    On November 25, 2015 – eight months after her previous assessment, in violation of the regulatory requirement that authorization periods cannot exceed six months – SHP conducted a re-assessment of Ms. Lo. The UAS report states "due to Parkinson's disease [Ms. Lo] stated that her whole body is in pain and that affects her ability to walk, bath, dress, she stated that when the [home attendant] is not available she will sometimes eat frozen food. Due to hand tremors she finds it difficult to cook." The report notes that she fell two months prior to the report when she was out with her home attendant and attempting to rush home so that her home attendant could leave on time. Despite finding that there had been no change in her overall self-sufficiency and ability to complete activities of daily living, on December 11, 2015, SHP proposed to reduce her home care hours from thirty-nine hours per week to twenty hours per week.

169.    Ms. Lo requested a fair hearing to challenge the reduction in home care hours. Ms. Lo attended the fair hearing, where the attorney for SHP withdrew its decision to reduce her benefits. The SHP representative told Ms. Lo that she would be reassessed in six months.

170.    Three months later, on April 13, 2016, SHP conducted a re-assessment of Ms. Lo, which found that she requires assistance with bathing, personal hygiene, dressing, walking, toilet transfer and toilet use. The report from the April 13, 2016 assessment notes that in February, while she was unattended, Ms. Lo lost her balance and fell when she was trying to get herself to the bathroom. The fall caused a fracture to her left shoulder. She was taken to the emergency room and discharged with pain medication and was receiving physical therapy to treat the injury. The assessor notes that Ms. Lo was experiencing a fear of being left alone, crying, sadness, and anxiety due to her recent fall. The report states that Ms. Lo receives treatment for anxiety and depression, which she finds helpful in alleviating her symptoms, but that she has had to skip her therapy appointments due to her shoulder injury.

171.    On May 4, 2016, SHP issued a determination reducing Ms. Lo's home care hours to twenty-eight hours per week. Ms. Lo requested a fair hearing to challenge this reduction. At the fair hearing, the SHP representative offered to reduce her hours to thirty-five hours per week. Ms. Lo agreed to take the reduction to thirty-five hours per week because she was anxious and scared she would lose more hours if she did not agree.

172.    Shortly after the reduction to thirty-five hours per week began, Ms. Lo fell several times while unattended in her home. She knew she needed more help and in July called The Legal Aid Society for assistance in requesting an increase in home care hours.

173.    On July 20, 2016, Ms. Lo's counsel called SHP to request additional hours. An SHP nurse care manager stated SHP's determination that it would not accept the request for an increase because Ms. Lo had recently stipulated to a decrease and there was no evidence that her condition had changed. SHP issued no written decision on this determination and, by definition, provided Ms. Lo with no written notice of her rights to appeal from SHP's determination. At the

urging of Ms. Lo's counsel, SHP later agreed to look into the matter further. Approximately one week later SHP agreed to process the request for an increase.

174.    On August 4, 2016, fifteen days after the original request and one day past SHP's fourteen day deadline to make a determination, SHP issued a notice stating that it was extending its deadline to obtain additional information.

175.    On August 4, 2016, SHP conducted an at-home assessment of Ms. Lo. The report from the assessment found that Ms. Lo needs assistance with activities of daily living due to a limited range of motion in her shoulder caused by the fall in February, fatigue relating to chronic illness, osteoarthritis, and pain. It further states that Ms. Lo's Parkinson's disease causes hand tremors, muscle weakness, poor balance, difficult walking, and limited ability to elevate her arms, bend or stand up for long periods of time. It also notes that Ms. Lo experiences frequent bladder incontinence. The report notes that Ms. Lo has had four to five falls in the past three months.

176.    On August 15, 2016, which was several weeks beyond SHP's fourteen day deadline, SHP issued a notice agreeing to increase Ms. Lo's hours back to the thirty-nine hours per week Ms. Lo was previously receiving.

177.    On September 13, 2016, Ms. Lo was diagnosed with having a pulmonary embolism and was admitted to the hospital. She was discharged the following day and prescribed weekly blood tests. These weekly appointments compound Ms. Lo's need for additional home care hours because she needs a home attendant to travel with her to her medical appointments.

178.    As a result of SHP's failure to provide her with homecare services she needs on weekends, Ms. Lo has suffered physical pain, emotional harm and a loss of dignity.

179.    Ms. Lo requires at least twelve hours of home care services per day, seven days per week, for total of eighty-four hours of care per week. Without additional home care hours to assist her with basic activities of daily living such as toileting, walking, bathing and dressing, Ms. Lo will likely continue to fall, incur unnecessary pain and bodily injuries and emotional harm. She is also at serious risk for institutionalization in a segregated setting such as a nursing home, even though she is capable of living in the community, in her home, if she were provided with the home care services that she needs.

180.    One individual, a non-examining medical director at the Healthfirst MLTC plans, made most of the final determinations as to how many hours each of the named Plaintiffs would receive.

## THE PROPOSED CLASS

181.    Plaintiffs bring this action under Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a class defined as follows:

> All current and future New York State Medicaid recipients who receive home care services through Healthfirst MLTC plans.

182.    Members of the proposed class depend on Medicaid-funded home care services provided by Healthfirst MLTC plans to remain safely in their homes and in their communities. In many cases, these individuals would have to permanently reside in a Medicaid-funded nursing home or other institution if not for these home care services.

183.    Under its obligations under the Medicaid Act and its implementing regulations, DOH contracts with the Healthfirst MLTC plans and requires the Healthfirst MLTC plans to comply with the Medicaid Act and its implementing regulations and state law and regulations when authorizing, processing requests for, providing, denying, reassessing, reauthorizing,

increasing, reducing, terminating and/or discontinuing Medicaid-funded home care services for Medicaid recipients who seek or receive home care services through the Healthfirst MLTC plans.

184.    This class is so numerous that joinder of all class members in this action would be impracticable. Approximately 16,000 individuals in New York State currently receive Medicaid-funded home care services from the Healthfirst MLTC plans.

185.    Class members cannot practicably assert their claims individually. By definition, the class members are impoverished and disabled individuals who lack access to legal services and the ability to pay for them on an individual basis. Moreover, New York currently funds legal services for these class members at a level that would allow for individual representation of no more than a small fraction of the class. Thus, their rights under the law may well be meaningless without certification of a class action seeking common redress.

186.    Members of the class, all of whom require home care services to remain safely in their homes, are vulnerable. By definition, they cannot manage alone. They have medical conditions, many of which are degenerative, such as Parkinson's disease, osteoarthritis, heart disease, hypertension, hyperlipidemia, hypothyroidism, and spinal stenosis, and require home care services for basic daily living activities, such as walking, toileting, bathing, dressing and cooking.

187.    Questions of law and fact are common to the class, and answers to these questions will drive resolution of the class claims. Common questions of law and fact include, but are not limited to, whether Defendants are violating Plaintiffs' rights secured by Article I of the U.S. Constitution, the Medicaid Act, the Due Process clause of the Fourteenth Amendment, the ADA and Section 504, stemming from common policies and actions, or an absence of common policies and failures to act, with respect to all class members, and whether declaratory and

injunctive relief is therefore appropriate. These common questions of law and fact predominate over individual questions.

188.    All named Plaintiffs have claims typical of the class in that they all are receiving an insufficient level of home care services from the Healthfirst MLTC plans, putting them at serious risk of injury or institutionalization and of losing their ability to remain in their homes and communities where they desire to live.

189.    The named Plaintiffs will adequately protect the rights of the class members. There are no conflicts of interest between the named Plaintiffs and the members of the class in that all would benefit if the Healthfirst MLTC plans are compelled to provide them a sufficient amount of home care services in compliance with the Medicaid Act.

190.    The named Plaintiffs and the proposed class members are represented by The Legal Aid Society and Winston & Strawn LLP, whose attorneys are experienced in class action litigation and will fairly and adequately represent the class.

191.    Class certification is appropriate under Rule 23(b)(2) because declaratory and injunctive relief is appropriate with respect to the class as a whole, as Defendants have acted on grounds generally applicable to the class.

192.    In the alternative, class certification is also appropriate under Rule 23(b)(1)(A) because prosecuting separate actions by individual class members will create a risk of inconsistent or varying adjudications that will establish incompatible standards of conduct for the party opposing the class. Fed. R. Civ. P. 23(b)(1)(A). Here, piecemeal adjudication of the class members' claims in separate proceedings would create inconsistent adjudications, with different judgments being made as to required procedures and protocols for both DOH and the Healthfirst Defendants.

193.     A class action is superior to other available methods for a fair and efficient adjudication of this matter in that the litigation of separate actions by individual class members would unduly burden the Court and create the possibility of conflicting decisions.

### CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF: Against Defendant Zucker**
**Violation of Article I and the Due Process Clause of the U.S. Constitution**

194.     Plaintiffs repeat and re-allege Paragraphs 1-193 as if set forth fully herein.

195.     The United States Constitution bars Congress from delegating to private parties the power to regulate the conduct of other parties.

196.     The Healthfirst MLTC plans are "not a department, agency, or instrumentality of the United States Government," but rather private entities. They are ultimately owned, operated and managed by for-profit entities, including HF Management Services, LLC, and HF Administrative Services, Inc.

197.     The Healthfirst MLTC plans and the Healthfirst Enterprise benefit financially whenever the plans deny or refuse to accept a request for increased home care hours or reduce the authorized hours of home care service.

198.     The Medicaid Act vests state agencies responsible for its administration at the state level (DOH, in this case) with legislative and rule-making authority to determine Medicaid recipients' levels of coverage for home care services and to carry out the provision of Medicaid benefits. DOH, however, has unconstitutionally delegated this legislative and rule-making authority to the Defendants in the Healthfirst Enterprise, as set forth above, including but not limited to the following ways: (a) permitting or even encouraging the Healthfirst MLTC plans and the Healthfirst Enterprise to violate the provisions of the Medicaid Act, the ADA and Section 504 (and their accompanying regulations) and the Due Process clause of the U.S.

Constitution; (b) failing to supervise and monitor the Healthfirst MLTC plans and the Healthfirst Enterprise to ensure that they are abiding by the provisions of the Medicaid Act, the ADA and Section 504 (and their accompanying regulations) and the Due Process clause of the U.S. Constitution; (c) permitting or even encouraging the Healthfirst MLTC plans and the Healthfirst Enterprise to engage in their own rule-making in carrying out the provisions of the Medicaid Act, and specifically permitting or encouraging them to promulgate rules favoring the financial interests of the Healthfirst Enterprise, to the detriment of the class members, all of whom are Medicaid recipients; and (d) failing to enforce the provisions of the Medicaid Act, the ADA and Section 504 (and their accompanying regulations) and the Due Process clause of the U.S. Constitution against the Healthfirst MLTC plans and the Healthfirst Enterprise, despite having delegated its authority to administer a portion of New York's Medicaid program to those entities.

199.    Plaintiffs have no adequate remedy at law for DOH's unconstitutional delegation of legislative and rule-making authority.

### SECOND CLAIM FOR RELIEF: Against All Defendants
### Violation of the Availability Requirement of the Medicaid Act

200.    Plaintiffs repeat and re-allege Paragraphs 1-199 as if set forth fully herein.

201.    As set forth above, Defendants have failed to provide Plaintiffs with the available assistance that is medically necessary and that they have requested. Defendants' failure to provide the requested assistance in sufficient amount, duration and scope to reasonably achieve the purpose of the Medicaid Act violates the Act's "availability" requirement. 42 U.S.C. § 1396a(a)(10)(A). Plaintiffs and the class may enforce the Act's availability requirement under 42 U.S.C. § 1983.

202.    Plaintiffs have no adequate remedy at law for these violations of the Medicaid Act.

**THIRD CLAIM FOR RELIEF: Against All Defendants**
**Violation of the Reasonable Promptness Requirement of the Medicaid Act**

203.    Plaintiffs repeat and re-allege Paragraphs 1-202 as if set forth fully herein.

204.    As set forth above, it is medically necessary that Plaintiffs receive more home care services than Defendants are currently providing to them, and they are entitled to receive those additional services under the Medicaid Act. Defendants have failed to provide Plaintiffs, in a reasonably prompt manner, with the assistance to which they are entitled. Defendants' failure to timely provide medically necessary home care services to Plaintiffs violates the reasonable promptness provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(8). Plaintiffs may enforce the Act's reasonable promptness requirement under 42 U.S.C. § 1983.

205.    Plaintiffs have no adequate remedy at law for these violations of the Medicaid Act.

**FOURTH CLAIM FOR RELIEF: Against All Defendants**
**Violation of the Americans with Disabilities Act**

206.    Plaintiffs repeat and re-allege Paragraphs 1-205 as if set forth fully herein.

207.    Plaintiffs are "qualified individual[s] with a disability" within the meaning of 42 U.S.C. § 12131.

208.    Defendants are each a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1), and U.S. Department of Justice implementing regulations, at 28 C.F.R. § 35.104. Defendants discriminate against Plaintiffs in violation of the ADA in several ways including: (a) placing Plaintiffs at risk of institutionalization and unnecessary segregation by failing to provide them with the appropriate level of medically necessary home care services, in violation of the ADA, 42 U.S.C. §§ 12131-12133, and its implementing regulations; (b) using methods of administration that discriminate against class members; and (c) failing to provide reasonable

45

modifications necessary for Plaintiffs to obtain and maintain eligibility for the appropriate level of medically necessary home care services.

209.    Providing adequate levels of home care services to Plaintiffs is a reasonably cost effective means of helping them maintain their lives in the most integrated setting possible while avoiding institutionalization in a nursing home or similarly segregated facility in which all or most of the residents are individuals with disabilities.

210.    Plaintiffs have no adequate remedy at law for these violations of the ADA.

**FIFTH CLAIM FOR RELIEF: Against All Defendants**
**Violation of Section 504 of the Rehabilitation Act**

211.    Plaintiffs repeat and re-allege Paragraphs 1-210 as if set forth fully herein.

212.    Defendants are subject to the requirements of Section 504, 29 U.S.C. § 794, with respect to the provision of home care services through the Medicaid program by virtue of the fact that they receive federal funds.

213.    Plaintiffs are qualified individuals with a disability under Section 504, 29 U.S.C. § 794(a).

214.    Defendants discriminate against Plaintiffs in violation of Section 504 in several ways including: (a) placing Plaintiffs at risk of institutionalization and unnecessary segregation by failing to provide them with the appropriate level of medically necessary home care services, in violation of Section 504, 29 U.S.C. § 794(a), and its implementing regulations; (b) using methods of administration that discriminate against class members; and (c) failing to provide reasonable modifications necessary for Plaintiffs to obtain and maintain eligibility for the appropriate level of medically necessary home care services.

215.    Providing adequate levels of home care services to Plaintiffs is a reasonably cost effective means of helping them maintain their lives in the most integrated setting possible while

avoiding institutionalization in a nursing home or similarly segregated facility in which all or most of the residents are individuals with disabilities.

216.    Plaintiffs have no adequate remedy at law for these violations of Section 504.

**SIXTH CLAIM FOR RELIEF: Against All Defendants**
**Violation of Due Process under the Medicaid Act**
**and 14th Amendment of the U.S. Constitution**

217.    Plaintiffs repeat and re-allege Paragraphs 1-216 as if set forth fully herein.

218.    Plaintiffs have a protected property interest in receiving the home care services to which they are entitled under New York State's Medicaid program.

219.    In making determinations as to the level of home care services a Medicaid enrollee will be provided, the Healthfirst MLTC plans function as an instrumentality of the State, and as such are required to provide Plaintiffs with procedural and substantive Due Process of law in making such determinations.

220.    In several ways, including (a) failing to record and accept Plaintiffs' requests for increased home care services, (b) failing to act promptly on Plaintiffs' requests for increased home care services, (c) failing to issue timely and adequate written decisions on Plaintiffs' requests for increased home care services, including notice about the level of home care medically needed and the level of home care the plan will authorize, (d) failing to provide written notice of Plaintiffs' rights to appeal from adverse decisions, (e) failing to adopt basic procedural safeguards to protect against erroneous or abusive reliance on "voluntary" care from Plaintiffs' family and friends, (f) misleading Plaintiffs by falsely asserting maximum limits on the number of homecare hours they can be approved for, and (g) subjecting class members to a flawed decision-making process, without consideration of legally required factors, specifically those concerning the actual level of home care services medically needed, Defendants have repeatedly failed to provide Plaintiffs with due process of law when Plaintiffs have made

requests for Medicaid services, including additional home care services, thereby violating Plaintiffs' due process rights under the Medicaid Act, 42 U.S.C. § 1396a(a)(3) and its implementing regulations, as well as Plaintiffs' due process rights under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, enforceable by Plaintiffs under 42 U.S.C. § 1983.

221.    Plaintiffs have no adequate remedy at law for these violations of due process.

**SEVENTH CLAIM FOR RELIEF: Against Defendants SHP and Healthfirst Health Plan, Inc.
Violation of the New York State Social Service Law
and Its Implementing Regulations**

222.    Plaintiffs repeat and re-allege Paragraphs 1-221 as if set forth fully herein.

223.    The Healthfirst MLTC plans are required to abide by the requirements of the New York State Social Services Law and its implementing regulations in their conduct relating to the provision of home care services to New York State Medicaid recipients.

224.    The Healthfirst MLTC plans have repeatedly failed to process and act upon requests for increased home care hours in a procedurally and substantively fair manner, as required by New York State Social Services Law §§ 363-369 and its implementing regulations on Medicaid services, 18 N.Y.C.R.R. §§ 358, 360, 505, *et seq*.

225.    Plaintiffs have no adequate remedy at law for these violations of State law.

**EIGHTH CLAIM FOR RELIEF:
Against Defendants SHP and Healthfirst Health Plan, Inc.
Violation of New York City Human Rights Law**

226.    Plaintiffs repeat and re-allege Paragraphs 1-225 as if set forth fully herein.

227.    HF Management Services, LLC, Senior Health Partners, Inc., HF Administrative Services, Inc., Healthfirst, Inc., and Healthfirst Health Plan, Inc., are each a "person" subject to N.Y.C. Administrative Code § 8-107(4)(a).

228.    Plaintiffs have disabilities within the meaning of N.Y.C. Administrative Code § 8-102(16).

229.    SHP and Healthfirst Health Plan, Inc. discriminate against Plaintiffs in violation of N.Y.C. Administrative Code § 8-107(4)(a) and (b) by refusing, withholding from or denying Plaintiffs advantages, facilities or privileges because of their disabilities and by representing that such advantages, facilities or privileges are not available when in fact they are.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter an Order:

(a)    Certifying this case as a class action, under Rules 23(b)(2) and 23(b)(1)(A) of the Federal Rules of Civil Procedures, with the class defined as:

> All current and future New York State Medicaid recipients who receive home care services through the Healthfirst MLTC plans.

(b)    Issuing a declaration that DOH's acts and omissions represent an unconstitutional delegation of legislative authority, in violation of Article I and the Due Process Clause of the U.S. Constitution, and that Defendants are violating the Medicaid Act, the ADA, Section 504 (and their accompanying regulations), the Due Process clause of the U.S. Constitution; and the New York State Social Services Law and its regulations implementing the New York State Medicaid program. N.Y. Soc. Serv. Law §§ 363-369; 18 N.Y.C.R.R. §§ 358, 360, 505, *et seq*.

(c)    Granting Plaintiffs preliminary and permanent injunctive relief against Defendants, requiring the Healthfirst MLTC plans to accept, record, and timely process all requests for increases in home care hours and notify Plaintiffs in writing of actions taken on such requests, including written notice of any rights Plaintiffs may have to appeal from the actions taken;

(d)     Granting Plaintiffs preliminary and permanent injunctive relief against Defendants to provide sufficient and medically necessary home care services to Plaintiffs;

(e)     Issuing a declaration that DOH and the Healthfirst MLTC plans have violated Plaintiffs' rights under the Medicaid Act (including (i) the availability requirement under 42 U.S.C. § 1396a(a)(10)(A), 42 U.S.C. § 1396(d)(a), and 42 C.F.R. § 440.230, and (ii) the reasonable promptness requirement under 42 U.S.C. § 1396a(a)(8), 42 C.F.R. § 435.906, and 42 C.F.R. § 435.930(a)), the ADA and Section 504; and that SHP and Healthfirst Health Plan, Inc. have violated the New York State Social Services Law and its regulations implementing the New York State Medicaid program. N.Y. Soc. Serv. Law §§ 363-369; 18 N.Y.C.R.R. §§ 358, 360, 505, *et seq*.

(f)     Granting Plaintiffs permanent injunctive relief against DOH, requiring it to monitor and supervise the Healthfirst MLTC plans and the Healthfirst Enterprise to enforce compliance with the Medicaid Act, the ADA, Section 504 (and their accompanying regulations) and the Due Process clause of the U.S. Constitution.

(g)     Granting Plaintiffs permanent injunctive relief against Defendants, requiring DOH to retrain the Healthfirst MLTC plans' staff (and the plans' staff to undergo such training) to ensure compliance with the Medicaid Act, the ADA, Section 504 (and their accompanying regulations) and the Due Process clause of the U.S. Constitution in the plans' provision of home care services to class members;

(h)     Granting the named Plaintiffs temporary, preliminary and permanent injunctive relief against Defendants, requiring the Healthfirst MLTC plans to provide Plaintiffs with the medically necessary home care services requested;

(i)     Awarding Plaintiffs' costs and disbursements of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and, with respect to each Healthfirst Defendant, N.Y.C. Administrative Code § 8- 502(g); and

(j)     Awarding such other relief as is just and proper.

Dated: October 24, 2016
New York, New York

Respectfully submitted,

By: /s/ Jeffrey L. Kessler

WINSTON & STRAWN LLP
  Jeffrey L. Kessler
  John M. Aerni
  Jeffrey J. Amato
  Jill K. Freedman
  Angela A. Smedley
  Johanna Rae Hudgens (not admitted)
  Edward C. Rooker (not admitted)
  Kathryn M. Kantha (not admitted)
  200 Park Avenue
  New York, NY 10166
  Tel: (212) 294-6700
  jkessler@winston.com
  jaerni@winston.com
  jamato@winston.com
  jfreedman@winston.com
  asmedley@winston.com
  jhudgens@winston.com
  erooker@winston.com
  kkantha@winston.com

THE LEGAL AID SOCIETY
  Judith Goldiner
  Kenneth Stephens
  Rebecca Novick
  Belkys Garcia
  Carol Santangelo
  Susan Welber
  Kathleen Kelleher
  199 Water Street
  New York, NY 10038
  Tel: (212) 577-3300
  jgoldiner@legal-aid.org
  kstephens@legal-aid.org
  ranovick@legal-aid.org
  brgarcia@legal-aid.org
  csantangelo@legal-aid.org
  sewelber@legal-aid.org
  kkelleher@legal-aid.org

*Attorneys for Plaintiffs*